IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| BENSON BRADLEY, | ) | |
| | ) | |
| PLAINTIFF, | ) | C.A. No. 4:14-CV-1772-RBH-KDW |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| U.S. FOODS, INC., f/k/a, | ) | |
| U.S. FOODSERVICE, INC. | ) | |
| | ) | |
| DEFENDANT. | ) | |

Plaintiff Benson Bradley ("Bradley" or "Plaintiff"), filed this action against his former employer, US Foods, Inc. ("US Foods," "Defendant," or "Company"),[1] alleging race discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* He also brings state-law claims for intentional infliction of emotional distress, wrongful termination, and negligent retention and supervision. Compl. ECF No. 1. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on Defendant's Motion for Summary Judgment. ECF No. 33.  Having considered the Motion; Plaintiff's Response, ECF Nos. 37, 38; Defendant's Reply, ECF No. 39; and applicable law, the undersigned recommends that Defendant's Motion for Summary Judgment be *granted* and this matter be ended.

I.      Introduction

In considering Defendant's Motion, the court considers all evidence in the light most favorable to Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nonetheless, as noted by Defendant, Plaintiff has not complied with Local Civil Rule 7.05 to

---

[1] Plaintiff's Complaint also identifies Defendant by its former name, U.S. Foodservice, Inc. The only proper Defendant herein is U.S. Foods, Inc. *See* ECF No. 39 at 1 n.1.

provide a "concise statement of the material facts in dispute with reference to the location in the record" in his responsive brief. Local Civ. Rule 7.05(A)(4) (D.S.C.). Rather, Plaintiff's "Statement of the Facts" in his response is written in an argumentative fashion and includes few record citations. Pl.'s Mem. 2-7, ECF No. 37. As a result, Defendant argues that its statement of the facts is not properly contested and is not in dispute. The undersigned agrees in principle that the facts as set out by Defendant could appropriately be considered undisputed for purposes of this Motion. *See Cox v. Se. Serv. Grp.*, No. CA 4:12-189-RBH-KDW, 2012 WL 3236145, at *2 (D.S.C. July 20, 2012) report and recommendation adopted, No. CA 4:12-CV-00189-RBH, 2012 WL 3236110 (D.S.C. Aug. 7, 2012) (denying without prejudice defendant's motion to dismiss for failure to comply with Local Civil Rules 7.04 and 7.05); *see also Trexler v. Giese*, No. 3:09-144-CMC, 2010 WL 3218883, at *2 (D.S.C. Aug. 12, 2010) (same).

*Counsel are reminded that compliance with Local Civil Rule 7.05(A)(4) and other Local Rules concerning motions and memoranda is mandatory. See* Local Civ. Rule 7.05(A) (setting out items a memorandum concerning a motion "shall contain"). The following statement of facts is taken in large part from Defendant's Memorandum. In this instance, though, the court will also consider herein relevant facts that Plaintiff has submitted that are properly supported by record citations.

US Foods provides food and service-related supplies to restaurants, hotels, schools and other customers. Decl. of US Foods Regional Sales Manager Raymond Riggs ("Riggs Decl.") ¶ 4, ECF No. 33-3. Plaintiff worked for US Foods as a Territory Manager ("TM") in the Myrtle Beach District of US Foods' Columbia, South Carolina Division. Pl.'s Dep. 29, 32-33; ECF No. 33-4. TMs are supervised by District Sales Managers ("DSM"), who are supervised by Regional Sales Managers ("RSM"). *Id.* During the relevant time period, DSM Jimmy Daniel served as Plaintiff's direct supervisor until September 2012, at which time Chip Caldwell became his

DSM. Caldwell Dep. 6, ECF No. 33-6. RSM Raymond Riggs supervised Daniel and Caldwell, and he served as Plaintiff's second line supervisor. Riggs Decl. ¶ 8.

A.    US Foods, Inc.'s Employee Handbook and Relevant Policies

Before employees perform work for the Company and periodically over the course of their employment, they must review the Company's equal opportunity policy. Riggs Decl. ¶ 5. The Equal Employment Opportunity and Affirmative Action Policy provides that employment decisions may not be made based on race or any other protected characteristic. Pl.'s Dep. 55; Employee Handbook ("Handbook"), ECF No. 33-5 at 16.[2] More specifically, the policy states:

> It is the intent of the Company to provide equal employment opportunity in all areas of its employment practices and to assure that there will be no unlawful discrimination against any employee on the grounds of race . . . or any other basis or protected characteristic protected by law. This policy extends to recruiting and hiring, to working conditions, training programs, promotions, use of Company facilities, discipline, discharge, and all other terms, conditions, and privileges of employment.

*Id.* The Employee Handbook further provides an Open Door Policy and Complaint Procedure that all employees should "feel free to seek information or help from members of management on any matter." Pl.'s Dep. 54, Handbook 15. Employees are advised they could address any issues or concerns with the individual's supervisor or manager, local human resources representative, second level supervisor, head of their Department, or the toll-free Check-In Line. *Id.* Handbook 54. Complaints made in good faith "will not result in any adverse action against the person making the call, and no other person who participates in good faith in an investigation will be treated adversely because of that participation." *Id.* at 54-55. The non-retaliation provision states:

> Any employee who engages in any form of prohibited retaliation under this policy will be subject to appropriate disciplinary action up to and including termination

---

[2] The Handbook begins on page 96 of ECF No. 33-4 and continues through page 68 of ECF No. 33-5.

of employment. Employees who believe they have been subject to retaliation must report it using the complaint procedure described in this Handbook or calling the Check-In Line.

*Id.* Plaintiff acknowledged that he received a copy of and was aware of these policies in the US Foods Employee Handbook. Pl.'s Dep. 52-58; Acknowledgements, ECF No. 33-5 at 69-75.

B.       Plaintiff's Employment at US Foods

1.       Plaintiff's Employment Background

Plaintiff began working for US Foods December 1999, as a TM based out of its Columbia, South Carolina Division. Pl.'s Dep. 29-30, 32-33. In June 2001 Plaintiff transferred to the Raleigh, North Carolina Division. *Id.* at 34-35. In October 2003, Plaintiff transferred to the Myrtle Beach area. *Id.* at 35-45. As a TM, Plaintiff contacted restaurants and other food service establishments in an attempt to solicit sales of food products and other food-related items. *Id.* at 43-44, Riggs Decl. ¶ 9. The Company assigns TMs to a specific territory within a specific district. Riggs Decl. ¶ 9. TMs recruit new customers and sell food products to US Foods' customers within their territory. *Id.*[3] TMs are expected to generate new customer relationships on their own. *Id.*

Generating new customers is referred to as developing "street sales" and involves knocking on doors and going business to business to obtain new clients. Pl.'s Dep. 42. As acknowledged by Plaintiff, the primary duty of a TM is to develop street sales. *Id.* at 43. TMs are also expected to maintain existing client relationships. Riggs Decl. ¶ 10.

---

[3] Plaintiff submits it "has been consistently testified to by other employees that there was no set area in Myrtle Beach sales." Pl.'s Mem. 6, 15 (citing Kyle Conder Dep. 10, ECF No. 38-10). However, TM Conder's referenced testimony does not so state:

Q: . . . [H]as it ever been communicated to you that you can't have customers outside of her area?
A: "No, not that I am aware of."

Conder Dep. 10. That another TM was "not aware" of something is not the same as there actually being no such policy.

US Foods' larger accounts are referred to as national chain accounts, which typically include groups of entities, such as restaurants, health care accounts, golf courses, or hotels. Riggs Decl. ¶ 11. These national accounts typically order the same type of products every period. *Id.*; Pl.'s Dep. 42-43. The pricing and other account administration is handled in-house by US Foods National Account managers. Riggs Decl. ¶ 11.  At times, these national accounts have TMs assigned to them who are involved in a limited capacity to handle any special orders and manage the accounts receivable process. *Id.*, Pl.'s Dep. at 42-43. National accounts require very little decision-making at the TM level. Riggs Decl. ¶ 11.

Beginning in 2012, TMs were also expected to meet SCOOP sale requirements. Pl. Dep. at 122:12-16; Riggs Decl. ¶ 18. SCOOP consists of various "high-end products" that the Company is promoting. Pl.'s Dep. 122. The expected number of SCOOP sales was set at the national US Foods management level, and TMs were expected to sell ten cases of SCOOP products a week. Riggs Decl. ¶ 18. Plaintiff was not able to meet that goal, and the Company lowered his goal to eight cases per week. Pl.'s Dep. 122, 136; Riggs Dep. 15-16, ECF No. 33-11. Riggs explained the goal was lowered to one thought to be more "realistic" for Plaintiff in hopes that Plaintiff would attain that goal and show improvement. Riggs Dep. 15-16.

 The Company measures a TM's performance based on a number of different factors including "the number of new customers they open, the number of cases of products sold to existing customers and the profit margin on these cases, and their ability to maintain positive relationships with existing customers." Riggs Decl. ¶ 19. US Foods also measures a TM's performance by the accounts receivable or "A/R" percentage, which is computed by comparing payments received against the balance owed on an account. Deposition of DSM Chip Caldwell ("Caldwell Dep.") 18, ECF No. 33-6. In addition to maintaining the overall A/R percentage

satisfactorily, TMs are expected to ensure that account issues or discrepancies, including credits that may need to be issued to a customer, are resolved in a timely manner. Riggs Decl. ¶ 19.

Riggs states that "US Foods strives to provide established accounts to all [TMs] in a fair and equitable manner." Riggs Decl. ¶ 12. Plaintiff was assigned the CentraArchy account, which consisted of a group of restaurants that had total annual revenue around approximately $4,000,000. *Id.* ¶ 13; Pl.'s Dep. 69. CentraArchy was a national chain account, which placed orders electronically without any assistance from Plaintiff. Riggs Decl. ¶ 13.[4] Plaintiff was to provide maintenance to CentraArchy, including ensuring that the restaurants received the correct products and that the invoices were accurate and paid. He was credited with sales on this account, and CentraArchy represented approximately 70% of Plaintiff's total sales. *Id.* In addition to the CentraArchy account, US Foods provided Plaintiff with other accounts, including the Village Inn Restaurant in Lumberton, North Carolina, which had an average annual revenue of $400,000, and Fish House, which had an average annual revenue of $200,000.[5] Riggs Decl. ¶ 17. Plaintiff was the recipient of the President's Cup and received recognition through the Senior Territory Manager program several years in a row. Pl.'s Dep. 76-82. These awards were based primarily on total sales and profits. *Id.* at 77. To be selected for the Senior Territory Manager program, TMs were required to produce $82,500 per week in sales and/or $11,000 per week in gross profits in a year, among other requirements. *Id.*, ECF No. 33-5 at 78.

As part of its national strategy and business plan, US Foods began moving larger national or chain accounts in-house, which resulted in TMs' no longer needing to be involved in the

---

[4] In his memorandum, Plaintiff states he "did much work" for CentraArchy, a larger account that was assigned to him, "as he had to place orders electronically, and convince the customer to purchase products that may have been cheaper than the competitor." Pl.'s Mem. 2 (no citation to record). The amount of work Plaintiff may have done for the CentraArchy account is not material to the court's recommendation herein.

[5] Plaintiff "recalls that Fish House was lost due to the owner losing his business." Pl.'s Mem. 6 (no record citation provided).

management of such accounts. Riggs Decl. ¶ 14. Instead, TMs could focus on developing individual street accounts on a local level, while the chain accounts would be managed entirely by US Foods' National Accounts Team. *Id.*; Caldwell Dep. 19. In 2012, Plaintiff's DSM Caldwell became aware that CentraArchy, which was already being managed in large part by the National Accounts team, would likely be moved entirely in-house. *Id.* at 28-29. As a result, Caldwell became concerned that Plaintiff would lose a significant part of his business as a TM and wanted Plaintiff to focus more strategically on developing street accounts. *Id.* at 19, 28-29. In February 2013, CentraArchy was moved entirely in-house to the National Accounts Team. Riggs Decl. ¶ 15.

### 2.    Plaintiff's Alleged Performance Problems

Throughout his employment with US Foods, Plaintiff had a number of performance issues that US Foods addressed with him through informal coaching, Performance Action Plans ("PAP"), and Performance Improvement Plans ("PIP"). Riggs Decl. ¶ 20. PAPs are plans developed by the employee's manager to establish steps and goals for the TM to meet the Company's expectations and are not considered disciplinary in nature. *Id.*

US Foods issued Plaintiff a PAP on December 11, 2009, which included a plan for growing business and getting "the numbers in the right direction." ECF No. 33-5 at 85. Among other areas for improvement, the December 2009 PAP requested that Plaintiff open two new accounts that would order on a weekly basis and that he completely clean up his aging accounts receivables. *Id.*

US Foods issued Plaintiff two 90-day PIPs. ECF No. 33-5 at 86-87 (June 14, 2010), ECF No. 33-5 at 94-95 (Oct. 1, 2012). PIPs include specific expectations and concrete goals that are established by the supervisor and provide a more formal performance-counseling process, which

includes weekly meetings with the supervisor to review performance and provide additional coaching to help the TM improve. Riggs Decl. ¶ 21.

The June 2010 PIP, Plaintiff's first, explained that Plaintiff's "street business, poor promotion results, as well as limited Foundations participation has led to [him] being placed on the [] 90 day Performance Improvement Plan." ECF No. 33-5 at 86-87. The June 2010 PIP specifically required Plaintiff to improve his sales, increase the amounts of sales on promotion items, and open two new accounts in the first 30 days of the PIP. *Id.* Plaintiff successfully completed this PIP. ECF No. 33-5 at 88 (email to Plaintiff from DSM Daniel noting PIP completed and Plaintiff had "shown an improvement in [his] day to day responsibilities").

Subsequently, US Foods issued Plaintiff additional PAPs on October 31, 2011, December 5, 2011, January 31, 2012, February 29, 2012, and June 1, 2012. ECF No. 33-5 at 89-93; *see also* Riggs Decl. ¶ 22. Generally, the PAPs highlighted that Plaintiff consistently needed to improve his street account sales and improve his A/R, including issuing credits and clearing up discrepancies in a timely manner. According to Defendant, these PAPs did not result in improved performance for Plaintiff.

US Foods issued Plaintiff a second PIP on October 1, 2012. ECF No. 33-5 at 95. In the October 2012 PIP, Plaintiff was informed that he was "being given an opportunity to improve [his] performance to acceptable levels over the next 90 days." *Id.* Plaintiff was specifically instructed through the PIP to improve in the following areas: (1) accounts receivables ("A/R")— clear all CentraArchy accounts' A/R by October 31, 2012; (2) SCOOP performance—average 8 cases sold per week of the fall 2012 SCOOP item; (3) Street Account growth—net two street accounts by the end of the month; (4) Communication—use the correct forms and provide necessary information with all communications; and (5) Errors in daily activity—order accuracy and better understanding of Edge. *Id.* A number of his clients assigned to Plaintiff requested a

different TM because they were not pleased with his service, including Fish House, Noisy Oyster, State Fair (later known as Sweet Carolinas), and Dirty Don's.[6] Riggs Decl. ¶ 23; Declaration of DSM Daniel ("Daniel Decl.") ¶ 6, ECF No. 33-12 at 3-4. In particular, these clients complained that Plaintiff was disorganized, poorly managed the A/R, did not handle paperwork in timely manner, and failed to follow-up on their requests. Daniel Decl. ¶ 6.

Defendant lost its relationship with Sweet Carolinas in September 2012. Riggs Decl. ¶ 23. Defendant attributes that business loss to Plaintiff's inefficient management of the account. *Id. See also* Pl.'s Dep. 242-44 (indicating he was not aware at the time that Sweet Carolinas was unhappy with the level of service he was providing).

On November 12, 2012, Plaintiff submitted his written resignation to Riggs. Pl.'s Dep. 262-63; ECF No. 33-5 at 96 (Nov. 12, 2012 Letter). Plaintiff resigned before his October 1, 2012 90-day PIP had expired. In response to a question from defense counsel, Plaintiff indicated he believed he would have accomplished the goals set for him in that PIP. Pl.'s Dep. 388-89.

### 3.    Plaintiff's Alleged Complaints and Resignation

In deposition, Plaintiff indicated he had raised complaints of race discrimination and retaliation to Thyra Austin, Vice-President of Human Resources ("HR"), and Cheryl McLaughlin, HR Manager (sometimes collectively referred to as "HR Representatives"). Specifically, Plaintiff claims that he complained to Austin about race discrimination sometime between 2007 and 2010. Pl.'s Dep. at 338. Plaintiff testified that he complained to McLaughlin about race discrimination and retaliation between 2008 and up through 2012 when he resigned, although he was unable to recall exact dates. *Id.* at 358, 360, 364-68.

---

[6] Although Daniel also lists "Breakfast House," Plaintiff indicates Breakfast House was not his account. Pl.'s Mem. 7.

Plaintiff was not aware of any race-based comments made by any US Foods employee. *Id*. at 343, 376. Plaintiff indicated he did not complain to Riggs, Caldwell, or Daniel about race discrimination or retaliation. Pl.'s Dep. 352-53. In discussing this, Plaintiff recalled a 2009 meeting he and all TMs in the Division attended with Division President of Conway, Durwood Owens. Plaintiff could not recall his exact words at that meeting, but indicated he broached the subject of race. He did not, however, specifically complain at the meeting regarding race discrimination or retaliation to Owens. Rather, Plaintiff stated he was made to feel uncomfortable. Plaintiff understood that Austin would pass along Plaintiff's complaints of racial discrimination. Pl.'s Dep. 349-53. Plaintiff was "pretty sure" his comments at the meeting with Owens got back to Riggs. *Id.* at 352-53.

Riggs, Daniel, and Caldwell testified that they were unaware that Plaintiff had raised any complaints of race discrimination or retaliation to US Foods during his employment. Riggs Dep. 40; Daniel Decl. ¶¶ 9-10; Declaration of Caldwell ("Caldwell Decl.") ¶¶ 5-6, ECF No. 33-13; Declaration of HR Manager for US Foods, Columbia Division, Cheryl McLaughlin ("McLaughlin Decl.") ¶ 9, ECF No. 33-8.

4.     Plaintiff's EEOC Charge

Plaintiff filed an EEOC Charge of Discrimination on October 9, 2012, alleging that US Foods discriminated against him based on his race and retaliated against him in violation of Title VII for the period beginning on January 9, 2012 and ending on October 9, 2012. ECF No. 33-5 at 97. Plaintiff makes no mention of harassment or any hostile work environment. *Id.* On March 27, 2014, the EEOC issued a Notice of Right to Sue to Plaintiff. ECF No. 33-5 at 99. The EEOC adopted the findings of the South Carolina Human Affairs Commission, which provided that, "[t]he Commission is unable to conclude, based upon the information obtained during its

investigation, that there has been a violation of the Human Affairs Law Section 1-13-10 *et seq.* of the SC Code of Law of 1976, as amended." ECF No. 33-5 at 98-99.

II.     Standard of Review

    A.     Motions for Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62

(4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. *See id.* at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

B.     Burden of Proof in Title VII Claims

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may demonstrate a violation of Title VII through direct or circumstantial evidence. When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Plaintiff does not argue he has presented any direct evidence of discrimination, *see* Pl.'s Mem. 4-

5, so the court considers his claims under the burden-shifting framework. Pursuant to this framework, once the plaintiff establishes a prima facie case of a violation of Title VII, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

While intermediate evidentiary burdens shift back and forth, the ultimate burden of persuasion that the defendant engaged in intentional discrimination remains at all times with the plaintiff. *See Reeves,* 530 U.S. at 146-47 ("The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'") (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993)).

III.    Analysis

Plaintiff's Complaint includes claims of race discrimination and retaliation in violation of Title VII, intentional infliction of emotional distress, negligent retention and supervision, and wrongful termination. ECF No. 1. Defendant moves for summary judgment as to each cause of action.

A.    Title VII Claims

In his deposition, Plaintiff raised a series of alleged acts in support of each of his claims. A summary of acts, as set forth by Defendant and as elaborated on by Plaintiff in his responsive memorandum,[7] follows:

- **Written Performance Counseling:** Plaintiff alleges that he was issued a number of PAPs and two PIPs. Pl.'s Dep. 360-62. Plaintiff also alleges that Caldwell discriminated against him based on his race because he issued him the October 2012 PIP within 30 days of becoming his DSM. *Id.* at 382-83.

- **Work-Related Emails:** Plaintiff claims that Riggs sent him emails, "in a very poor manner, telling my [sic] how to do something, in a manner of telling me; I'm not going to tell you no more; or this is my last time talking to you." Pl.'s Dep. 340. Riggs also sent Plaintiff an email advising him not to "send any e-mails out about your vacation, because it's not your place and nor does anyone care that you're on vacation. Just don't do it again." *Id.* at 341. Plaintiff admits that Riggs did not mention race in any of his emails. *Id.* at 343. Plaintiff also points to other work-related emails from Riggs that he gave to Division President Owens at the 2009 meeting. *Id.* at 326, 362.

- **Support as a TM:** Plaintiff alleges he was not provided sufficient support to allow for the growth of his business because of his race. Plaintiff claims that Daniel discriminated against him based on his race because Daniel did not "give [him] the help that he would give [] white-coworkers, Kyle [Conder] and Bo [Steele], to help build [his] business." Pl.'s Dep. 377. Plaintiff claims that his managers did not go on a sufficient number of "ride-withs" with Plaintiff, whereby a supervisor would spend time riding with the TM to observe his client interactions and provide advice and tips on improving his sales efforts. *Id.* at 269-70.

- **Account Distribution:** In a similar vein, Plaintiff alleges he was not permitted certain accounts outside of the geographic area, including being denied the opportunity to work a Hampton Inn in Murrell's Inlet. Pl.'s Dep. 276-77. In support of this allegation, Plaintiff submits the affidavit of Hampton Inn Manager, Linda

---

[7] Not discussed herein are incidents Plaintiff identified in deposition but does not pursue in responding to Defendant's Motion. *Cf. Lee v. Jasper Cnty.*, No. 9:09-1878-SB-BM, 2012 WL 7149678, at *8 (D.S.C. Sept. 6, 2012) (noting undefended claims regarded as abandoned) (citing *Burns v. Air Liquide Am., L.P.*, 515 F. Supp. 2d 748, 759 n.9 (S.D. Tex. 2007)), *report and recommendation adopted*, No. CIV.A. 09-1878, 2013 WL 594890 (D.S.C. Feb. 14, 2013). For example, Plaintiff claimed discrimination because he was selected for drug tests three times in 2009. Pl.'s Dep. 304-05. Similarly, Plaintiff's memorandum does not address his complaint of having been asked by Riggs three times in one day whether he had taken anything from the warehouse that did not belong to him. *See id.* at 298.

Davis. Davis states she wanted to work with Bradley, but was advised by Riggs that her location was out of Plaintiff's territory. Linda Davis Aff., ECF No. 38-8. Plaintiff also alleges he was assigned accounts with lower revenues than accounts assigned to Steele and Conder. Pl.'s Dep. 377. Plaintiff further claims that certain accounts, such as the J. Reuben Long Detention Center, were taken away from Plaintiff due to his race. *Id.* at 273.[8]

### 1.    Pre-December 14, 2011 Events

Plaintiff was required to file his EEOC Charge within 300 days after an "alleged unlawful employment practice" occurred. 42 U.S.C. § 2000e-5(e)(1); *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (citing *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 439 (4th Cir. 1998)). Plaintiff filed his EEOC Charge on October 9, 2012, and Defendant argues any events that took place more than 300 days prior—meaning prior to December 14, 2011—are not timely considered in evaluating Plaintiff's Title VII claims. Def.'s Mem. 15-16. Defendant submits it is "entitled to summary judgment" as to Plaintiff's allegations regarding the 2009 drug testing, as well as any emails or counseling documents from the pre-December 14, 2011 period. Def.'s Mem. 15-16.

Plaintiff does not take issue with the 300-day time frame; however, he argues discriminatory allegations outside that time frame may still be considered as "'background evidence for valid claims.'" Pl.'s Mem. 9-10 (quoting *Evans v. Tech. Appls. & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996)).

The undersigned finds that only events that took place on or after December 14, 2011 should be considered in analyzing Plaintiff's Title VII claims. However, the court will consider whether summary judgment is appropriate on a cause-of-action-by-cause-of-action basis and

---

[8] As explained by Riggs, Plaintiff never actually had the J. Reuben Long Detention Center account assigned to him. Riggs Dep. 26-27. That account was on a bid system and another DSM, Mark Lane, submitted bids for it. *Id.*

does not recommend entry of summary judgment as to specific incidents at this point. The earlier incidents may be considered as background. *See Evans*, 80 F.3d at 962.

### 2.     Race Discrimination

#### a)     Prima Facie Case

Defendant seeks summary judgment as to Plaintiff's Title VII race discrimination claim. Lacking direct evidence, Plaintiff can establish a prima facie case of disparate treatment by showing the following: (1) he is a member of a protected class; (2) he was qualified for the job and his performance satisfied his employer's expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside his protected class received more favorable treatment. *See Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). "Liability in a disparate-treatment case depends on whether the protected trait actually motivated the employer's decision." *Young v. United Parcel Serv.,* 135 S. Ct. 1338, 1345 (2015) (quoting *Raytheon Co. v. Hernandez,* 540 U.S. 44, 52 (2003)).[9] Defendant does not focus on the first two prongs, but argues Plaintiff cannot satisfy the third or fourth prongs.

#### i)   Adverse Employment Action

Defendant argues the complained-of conduct does not constitute an adverse action for purposes of his Title VII discrimination claim. "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

---

[9] Plaintiff acknowledges this prima facie framework can be used by Plaintiff in his Title VII claim, and he provides argument based on this framework. However, Plaintiff  but also argues courts should be flexible in the use of the *McDonnell Douglas* framework. *See* Pl.'s Mem. 10-12. While the undersigned agrees that the *McDonnell Douglas* framework is not to be rigidly applied, that framework is appropriate in this matter and the court applies it herein.

decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).[10]

Defendant submits the performance plans (PAPs and PIPs), emails, support as a TM, and other complained-of actions do not rise to the level of being an adverse employment action as they did not adversely impact Plaintiff's employment. Def.'s Mem. 17. In response, Plaintiff submits the action plans, the requirement that he reach "unattainable goals (such as 100% of his accounts resolved)," the disparaging emails, and that his "complaints of unfair treatment were all but ignored[,]" were adverse actions sufficient to satisfy this prong of his prima facie case. Pl.'s Mem. 12. Although Plaintiff also notes in this regard that "McLaughlin made inquiries into Plaintiff's account," Plaintiff provides no record citation or context for this, and the court does not specifically consider it. It is difficult to imagine how an HR representative's "looking into" an employee's accounts could amount to an adverse employment situation in any event.[11]

The undersigned agrees with Defendant. Regarding the performance plans, only those after December 2011 would be actionable based on the statute of limitations: the October 4, 2012 PIP, and the 2012 PAPs dated January 31, February 29, and June 1. As an initial matter, the only record evidence concerning PIPs is that Defendant does not consider them to be disciplinary in

---

[10] Plaintiff seems to argue the less-stringent definition of "adverse employment action" applicable to retaliation cases should also be applied to his discrimination claim. Pl.'s Mem. 12-13 (citing, *inter alia, Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) for proposition the "'substantial employment action' doctrine is certainly questioned"). Plaintiff offers no legal support for that argument. Further, the court notes that, subsequent to *White*, the Fourth Circuit has continued to apply the more stringent definition of adverse employment actions to Title VII discrimination claims. *E.g., Holland v. Washington Homes, Inc.,* 487 F.3d 208, 219 (4th Cir. 2007); *Jyachosky v. Winter,* 343 F. App'x 871, 877 (4th Cir. 2009).

[11] Elsewhere in his memorandum, Plaintiff references the testimony of Linda Jones, a credit manager with Defendant, to show that "McLaughlin made a request to Linda Jones to pull Plaintiff's accounts and bring them to her." Pl.'s Mem. 5 (citing Jones Dep. 14, ECF No. 38-12). He also notes Jones' opinion that Plaintiff's performance numbers were "average." *Id.* Jones acknowledged she did not discuss Plaintiff's accounts with McLaughlin. Jones Dep. 14. Nothing in Jones' testimony or otherwise makes an examination of accounts an adverse employment action.

17

nature. Riggs Decl. ¶ 20. Although a PIP is considered a more formal process, *id.* ¶ 21, Plaintiff has not demonstrated that the October 2012 PIP had an adverse impact on his employment. In fact, Plaintiff testified that, had he not resigned,[12] he believed he would have accomplished the goals set for him in that PIP. Pl.'s Dep. 388-89.[13] *See, e.g., Cottman v. Rubin*, 35 F. App'x. 53, 55 (4th Cir. 2002) (affirming grant of summary judgment, inter alia, plaintiff's being placed on a performance improvement plan did not amount to adverse action); *McKie v. Wachovia Corp.,* No. 3:05-2654-CMC-JRM, 2006 WL 3098772, at *7 (D.S.C. Oct. 30, 2006) (finding plaintiff failed to show "that any criticism of her performance . . . in August 2003 or her performance review in March 2004 were adverse employment actions").

Plaintiff also points to his being given "unattainable goals (such as 100% of his accounts resolved). Pl.'s Mem. 12. Plaintiff notes the Fourth Circuit has not ruled on whether an employee being given "work responsibilities in contrast to others similarly situated" would be an adverse employment action. *Id.* Inexplicably, the only case cited in connection with that argument is *Peterson v. West*, 17 F. App'x 199 (4th Cir. 2001). In that case, the court noted that "[h]iring, granting leave, discharging, promoting, and compensating" was not intended as an exhaustive list of what constituted an "ultimate employment decision" for purposes of adverse actions in discrimination claims brought by federal employees. *Id.* at 202. Further, in that case the court upheld the grant of summary judgment because, although the plaintiff's "job duties had changed," he had not demonstrated his title, benefits, or salary had been changed. *Id.*

---

[12] Plaintiff's claim that his resignation was constructive discharge is discussed separately.
[13] Plaintiff's assumptions, of course, may not constitute competent evidence at trial and are not determinative at this summary-judgment stage.

Plaintiff has not presented a cogent argument that anything that allegedly happened to him[14] was an adverse employment action. *Cf. Holland*, 487 F.3d at 219 (noting different job assignment does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position) (internal citations and quotations omitted).

Plaintiff was not terminated. Rather, he claims he was constructively discharged. *See, e.g.*, Compl. ¶ 24. In its Motion, Defendant separately analyzes Plaintiff's "constructive discharge claim," arguing he cannot satisfy the standard. Def.'s Mem. 23-25. In a short response, Plaintiff submits he was "the victim of constructive discharge" based on "heightened scrutiny and the requirement that he meet unattainable goals." Pl.'s Mem. 16. He claims his "separation was not a voluntary resignation, but the response to his hostile work environment based on the lack of response from defendants." Pl.'s Mem. 16.

As an initial matter, as the court recently noted in *Alford v. Wang, Inc.*, 11 F. Supp. 3d 584, 594 (D.S.C. 2014), the "constructive discharge concept is the legal fiction by which wrongful termination claims are salvaged where no actual termination or other adverse employment action has, in fact, occurred." In other words, constructive discharge is an element of a structurally larger claim, *to wit,* Title VII, Section 1983, the South Carolina Whistleblower Act, as opposed to some legal end unto itself. Constructive discharge is the manner in which a plaintiff seeks to establish an element such as an "adverse employment action" for a Title VII discrimination claim. *See id.*; *see also Honor v. Booz-Allen & Hamilton, Inc.,* 383 F.3d 180, 186 (4th Cir. 2004) (discussing constructive discharge in the context of wrongful termination, Title VII, and Section 1981 claims); *Goldsmith v. Mayor & City Council of Baltimore,* 987 F.2d 1064,

---

[14] The "disparaging emails" about which Plaintiff testified fall outside the time period under consideration. In any event, they do not rise to the level of an adverse employment action. Similarly, that Plaintiff's "complaints of unfair treatment were all but ignored," Pl.'s Mem. 12, does not present any actionable adverse action.

1072 (4th Cir. 1993) (discussing constructive discharge in the context of a state law claim for intentional interference with contract and prospective advantage).

In any event, the undersigned agrees with Defendant that Plaintiff has not established he was constructively discharged. Constructive discharge occurs in the employment discrimination context when an employer deliberately makes the working conditions of the employee so intolerable in an effort to induce the employee to quit or force the employee into involuntary resignation. *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1353–54 (4th Cir. 1995) (citing *Bristow v. The Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985); *Ugalde v. W.A. McKenzie Asphalt Co.,* 990 F.2d 239, 242–43 (5th Cir. 1993)). *See Byers v. HSBC Fin. Corp.,* 416 F. Supp. 2d 424, 441–42 (E.D. Va. 2006) ("Intolerability is judged by an objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign.") (citing *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985)). Because claiming constructive discharge is "susceptible to abuse by those who voluntarily leave their employment," it must be "strictly cabined." *Alba v. Merrill Lynch & Co.*, 198 F. App'x 288, 294 (4th Cir. 2006).

Plaintiff's argument falls short. His being given "heightened scrutiny" and "unattainable goals," even if assumed to be true for these purposes,[15] would not rise to the level of demonstrating constructive discharge. *See, e.g., Williams v. Giant Food Inc.,* 370 F.3d 423, 434 (4th Cir. 2004) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.") (citation omitted).

---

[15] This is not to say that Plaintiff has presented competent evidence of "heightened scrutiny" or unattainable goals attributable to racial discrimination.

Plaintiff cannot satisfy the adverse-employment-action prong of his prima facie case for Title VII discrimination by way of the constructive discharge doctrine. Because Plaintiff has presented no evidence of an adverse employment action related to this claim, summary judgment is appropriate on Plaintiff's Title VII race-discrimination claim.

### ii) Similarly Situated Comparators

Even if Plaintiff were considered to have established an adverse employment act for purposes of the discrimination claim, summary judgment is appropriate because he cannot satisfy the fourth and final prong of the prima facie case: that others who were of a different race (non-African American) but were otherwise similarly situated received more favorable treatment under similar circumstances. As Defendant argues, Plaintiff cannot satisfy this prong because, regardless of which allegedly adverse action is discussed, Plaintiff has not identified another non-African-American employee who had substantially similar performance deficiencies. *See* Def.'s Mem. 18-19.

To show similarly situated colleagues were comparators, plaintiffs must show that "they are similar in all relevant respects to their comparator." *Haywood v. Locke,* 387 F. App'x 355, 359 (4th Cir. 2010). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992)); *see also Ward v. City of N. Myrtle Beach,* 457 F. Supp. 2d 625, 643 (D.S.C. 2006). It is true that such comparisons "will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th Cir. 1993). Nonetheless, a plaintiff can only draw a comparison where "discipline [is] imposed for like offenses." *Id.; see also Lightner v. City of*

*Wilmington, N.C.,* 545 F.3d 260, 265 (4th Cir. 2008) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful."). In considering whether acts are comparably serious, a court should consider "the gravity of the offenses on a relative scale." *Moore v. City of Charlotte,* 754 F.2d 1100, 1107 (4th Cir. 1985).

Plaintiff's attempt to establish comparators who were treated differently seems to focus on his having been placed on a performance plan when others were not. He argues generally that "there is a question of fact as to whether or not salesmen who did not meet goals were even being reviewed at the same time that Plaintiff was being consistently reprimanded by Defendant[]." Pl.'s Mem. 13-14. He continues, "Defendant[] cannot deny that the only other salesman comparable to Plaintiff that was placed on a performance plan was placed on one in 2013. Plaintiff's co-worker Steele admitted to having low numbers and was not reprimanded." *Id.* at 14.

Elsewhere in his memorandum, Plaintiff sets out some evidence that arguably relates to this prong being considered. For example:[16]

- Plaintiff notes the 2010 email from Daniel indicating he had successfully completed his June 2010 90-day PIP. ECF No. 28-1.

---

[16] This list is intended to be representative of facts potentially supporting Plaintiff's argument. Many of the facts Plaintiff references attempt to "excuse" problems identified in Plaintiff's various action plans by demonstrating other TMs may have experienced similar issues at times. *See* Pl.'s Mem. 2-7. For example, in his "Statement of the Facts," Plaintiff proffers deposition testimony of Caucasian TM Kyle Conder, in which he agreed it was "customary to grow and lose customers" and noted that losing and gaining business is "just part of the business." Conder Dep. 32, ECF No. 38-10. Plaintiff argues this means that "any complaint about Plaintiff losing accounts is no different than Conder's lost accounts." Pl.'s Mem. 6. The undersigned has considered this and other evidence presented by Plaintiff in making this Report and Recommendation. However, the court notes that evidence that another TM experienced some of the same performance issues as Plaintiff misses the larger point of what Plaintiff must demonstrate—that a non-African-American TM similarly situated to Plaintiff in all relevant respects received more favorable treatment.

- Plaintiff provides a list of TMs and their A/R percentages collected in 2011 to show Plaintiff "was competitive with his coworkers." Pl.'s Mem. 3; ECF No. 38-2 (A/R chart listing other TMs by name; percentages range from 40.95-106.91);

  o During that time Plaintiff, whose A/R collection percentage was 87.61, was given a PAP, ECF No. 38-3 (Oct. 31, 2011 PIP). Others in that group with lower A/R-collections percentages, were not. (No record citation for this statement).

- Riggs testified that, as to the TMs in Caldwell's district, he did not recall giving PIPs in 2012 to anyone other than Plaintiff. Riggs Dep. 28-29, ECF No. 38-6.

- Caldwell testified he placed Plaintiff on a PIP because "there had been some slipping in pretty much all aspects of his performance." Caldwell Dep. 18, ECF No. 38-7.

- Plaintiff points particularly to testimony from Robert Steele (Caucasian) that he had not been placed on an action plan although he was below 90 percent in his A/R collection for about four of the 12 months in a year. Steele Dep. 29-30, ECF No. 38-11.

Plaintiff also proffers evidence that seems to relate to the comparator analysis, but does not advance his argument. For example, Plaintiff provides testimony of African-American TM Phil Mathis. ECF No. 38-5. It is elementary that information regarding the treatment of other TMs of the same race as Plaintiff cannot establish that Plaintiff was treated differently from comparators outside his class. *See generally, Lightner*, 545 F.3d at 264-5 (noting comparator must be "of another race . . .").

The bottom line is that, while Plaintiff has pointed to some general testimony about other TMs who were not placed on action plans, he has not provided sufficient detail that permits the necessary comparison. Plaintiff's "salesmen who did not meet goals," Pl.'s Mem. 13-14, is simply too broad a comparative net. That one TM did not meet one goal in one particular month or that several TMs with lower collections percentages than Plaintiff for a given month (or year) did not receive a written action plan to focus on improvement is not enough. As Plaintiff's direct supervisor, Caldwell, testified, Plaintiff's PIP was the result of Caldwell's viewing of all of Plaintiff's statistics and his noting he had been "slipping in pretty much all aspects of his

23

performance." Caldwell Dep. 18. Caucasian TM Steele testified that he had some bad months when he did not collect the company goal of 90% of his A/R but was not put on any sort of performance plan. Steele Dep. 29-30. That Steele "admitted to having low numbers and [not being] reprimanded[,]" Pl.'s Mem. 14, is insufficient. Plaintiff has not pointed to evidence of other metrics regarding Steele's performance, nor has he provided other details to show Steele was an appropriate comparator. Plaintiff cannot satisfy the final prong of the prima facie discrimination case. Summary judgment is appropriate.

b)       Pretext Analysis

Even if Plaintiff could establish his prima facie case, summary judgment is appropriate. Defendant set out legitimate business reasons to issue action plans to Plaintiff, including his performance numbers and that one of his major customers would potentially be going in-house. Plaintiff has not set forth sufficient evidence to demonstrate Defendant's explanation for his treatment was merely pretextual.  *See Atkins v. Holder*, 529 F. App'x 318, 320 (4th Cir. 2013) (noting if a plaintiff puts forth a prima facie case, defendant must offer a nondiscriminatory explanation for the action(s) and then the burden of proof returns to plaintiff to show the employer's proffered explanation is pretextual) (Title VII); *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2005) (same in retaliatory discharge context). Courts are not to second-guess an employer's decision on human resources matters, so long as such decisions are not based on an unlawful reason. "Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity. . . ." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006).  "[I]t is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir.

1998). Plaintiff cannot show that Defendant's stated reasons for his treatment were pretext and that he was treated differently because of his race.

Citing many of the same examples discussed above in considering his comparators, Plaintiff submits he has "create[d] at least a question of fact as to the veracity of Defendant's claims that Plaintiff was performing in a way that was different than and more deficient than his Caucasian co workers." Pl.'s Mem. 16. As noted above, the court is not to determine whether the proffered reason "was wise, fair, or even correct, ultimately, so long as it truly was the reason for [action against the employee]." *DeJarnette*, 133 F.3d at 299. In order to prove pretext a plaintiff can show a defendant's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [] discrimination." *See Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (internal quotation marks omitted). Plaintiff's examples of other TMs with high uncollected A/R percentages and the like do not provide evidence sufficient to establish that discrimination was the "real reason" for the actions. For a plaintiff to prove an employer's articulated reason is a pretext for discrimination, he "must prove *both* that the reason was false, *and* that discrimination was the real reason for the challenged conduct." *Jimenez* v. *Mary Wash. Coll.,* 57 F. 3d 369, 378 (4th Cir. 1995) (emphasis in original) (internal quotation marks and citations omitted). Plaintiff has not established pretext. Defendant's Motion should be granted as to Plaintiff's Title VII claim of race discrimination.

B.     Title VII Retaliation Claim

Plaintiff also raises a claim of retaliation pursuant to Title VII. A plaintiff may demonstrate a violation of Title VII through direct or circumstantial evidence. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in

an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). When, as here, direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *See Foster v. Univ. of Md.-Eastern Shore,* ——— F.3d ———, 2015 WL 2405266, at *5 (4th Cir. May 21, 2015) (recently confirming the *McDonnell Douglas* framework remains appropriate when Title VII retaliation plaintiff is not proceeding under direct-evidence, so-called "mixed motive" theory). First, a plaintiff bears the burden of establishing a prima facie case of retaliation by showing the following: "(1) []he engaged in a protected activity; (2) the employer took an adverse employment action against [him]; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2011) (internal quotation omitted). If the plaintiff presents a prima facie case, the burden then shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse action. If the employer sets forth a legitimate, non-retaliatory reason for the action, the plaintiff then bears the burden of showing the employer's proffered reasons are pretextual or his claim will fail. *See Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004).

Recently, the United States Supreme Court clarified that, in the Title VII retaliation context, a plaintiff must prove retaliation was the but-for cause of the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). In other words, the successful plaintiff in a Title VII retaliation suit must show that the complained-of injury would not have occurred "but for" the alleged retaliatory motive. *Id.; see also id.* at 2524-25. In so holding, the Court rejected the argument that a Title VII retaliation claimant had to establish the lessened "motivating-factor" causation standard applicable to some status-based Title VII causes of action. *See* 133 S. Ct. at 2533-34. The *Nassar* case was before the Court subsequent to a jury verdict that had not involved proof by way of the *McDonnell Douglas* framework, so

the Court did not discuss whether the prima facie case remained viable in such claims and, if it did, whether the but-for causation requirement would be considered as part of a plaintiff's prima facie case or part of the pretext analysis. Noting some confusion on the issue post-*Nassar*, the Fourth Circuit determined in *Foster* that the *McDonnell Douglas* framework remains viable and that the but-for causation requirement is part of plaintiff's proof at the pretext stage. 2015 WL 2405266, at *4-6.[17]

Plaintiff alleges that after he complained to Austin in 2008, he received a PIP each year. He notes that his treatment had improved for some time after the meeting. Pl.'s Dep. 335, 349-50. Plaintiff also claims that after he complained to McLaughlin between 2008 and 2012, the harassing behavior from Riggs and Caldwell continued. *Id*. at 364-68. Plaintiff notes he was unsure why Riggs, Caldwell, or Daniel retaliated against him or did not like him. *Id.* at 373-75.

In its Motion, Defendant does not dispute that Plaintiff can satisfy the first prong of his prima facie case—that he engaged in protected activity—but argues Plaintiff cannot satisfy the adverse-action or causation prongs of his prima facie retaliation case. Def.'s Mem. 25-27.[18]

While the standard for establishing an adverse action is not as stringent in retaliation cases as it is in discrimination matters, the undersigned is of the opinion that Plaintiff still cannot establish the complained-of actions were adverse employment actions. *See Burlington Northern & Santa Fe Rwy. v. White*, 548 U.S. 53, 64 (2006). The Court noted these actions did not necessarily have to "affect terms and conditions of employment." However, the anti-retaliation provision "protects an individual not from *all* retaliation, but from retaliation that produces an

---

[17] Although Defendant argues *Nassar*'s but-for causation standard is applicable at the prima facie causation stage, its brief was submitted before the *Foster* opinion was released in May 2015.

[18] In its Reply, Defendant appropriately notes that some of Plaintiff's general complaints of "unequal treatment and favoritism" do not amount to protected activity for purposes of retaliation claims. Def.'s Reply 9-10. The undersigned agrees and addresses this point in considering the causation prong of the prima facie case.

injury or harm." *Id.* at 67 (emphasis added). Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citations omitted).

Plaintiff argues the "heightened scrutiny and requirements to meet unattainable goals" were sufficiently adverse to be considered adverse actions in this context. Pl.'s Mem. 18. The undersigned disagrees. An objective worker would not find the actions discussed above to be materially adverse such that they "might have dissuaded a reasonable worker" from making a charge of discrimination. *See, e.g., Jackson v. Winter,* 497 F. Supp. 2d 759, 771 (E.D. Va. 2007) (determining that a written reprimand placed in employee's personnel file was not sufficiently adverse for purposes of a Title VII retaliation claim).

In any event, even if the heightened scrutiny and goals could be considered adverse actions in this context, Plaintiff cannot establish the final prong of the Title VII retaliation prima facie case: that a causal connection existed between the actions and Plaintiff's alleged reporting of racial discrimination. Plaintiff cannot establish the causal connection element of his prima facie retaliation claim as none of the decision-makers with respect to his PAPs, PIPs, or any of the other complained of conduct were aware of his alleged complaints of discrimination and retaliation to HR. Without proof of the decision-maker's knowledge of his alleged protected activity, his claim cannot survive summary judgment. The law is clear that the decision-maker's "knowledge that the plaintiff engaged in a protected activity is absolutely necessary" to establish a causal connection between the protected activity and the adverse employment action. *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir. 1998), abrogated on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006); *see Finnegan v. Dep't of Pub. Safety & Corr. Servs.,* 184 F. Supp. 2d 457, 463 (D. Md. 2002) ("a plaintiff must

establish that when taking the adverse action, an employer had knowledge that the plaintiff had engaged in protected activity.").

In this case, the undisputed record evidence establishes that the decision-makers, Riggs, Caldwell, and Daniel, had no knowledge of Plaintiff's alleged complaints to HR when they issued the PAPs, PIPs, or sent Plaintiff the allegedly retaliatory e-mails. Riggs Dep. at 40 (recalls being advised by HR of some concerns and complaints made by Plaintiff, but was unaware of any claim of discrimination ever raised by Plaintiff); McLaughlin Decl. ¶ 9 (HR representative noting she did not inform Riggs, Daniel, or Caldwell that Bradley had made complaints of discrimination or retaliation against Defendant); Caldwell Decl. ¶¶ 5-6; Daniel Decl. ¶¶ 9-10.  In deposition, Plaintiff spoke of race-based complaints he raised to HR representatives, but admitted he did not specifically claim he had been discriminated against because of race in a 2009 meeting with Division President Owens. *See* Pl.'s Dep. 349-53. Rather, Plaintiff believed HR would share that information. *Id.* at 351-52.

In his response to Defendant's Motion, Plaintiff argues that "[e]ach supervisor and co-worker[] acknowledged that Plaintiff shared complaints of unequal treatment and favoritism." Pl.'s Mem. 17. Importantly, Plaintiff provides no citation to the record for this statement. Based on that alone, Plaintiff's retaliation claim could be dismissed. To the extent Plaintiff is relying on the testimony of Plaintiff's fellow TM Mathis (African American) regarding what was said at the meeting with Owen, *see* Pl.'s Mem. 3-4 (citing to Mathis Dep., ECF No. 38-5), that information would be inadmissible hearsay. *See Md. Highways Contractors Ass'n v. State of Md.,* 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.").[19]

---

[19] The undersigned has reviewed all testimony of Mathis discussed by Plaintiff. None of that testimony or argument set forth by Plaintiff based on Mathis' testimony is sufficient to

The undersigned makes note of the affidavit of former US Foods employee Jennifer Agresta Aguruso, who stated, "I can verify that [Plaintiff] and I both sat with Chip Caldwell and explained the unfair treatment within the workplace." Aguruso Aff. ¶ 4, ECF No. 38-9. This evidence does not change the recommendation. Aguruso references discussions of "unfair treatment," but, tellingly, does not testify that they made specific reference to race discrimination. Indeed, the court is unsure of the race of Ms. Aguruso.

As pointed out by Defendant on Reply, it is not enough that a supervisor be aware of an employee's general complaint of unequal or unfair treatment to causally link actions as retaliation for having engaged in protected activity. *Cf. Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) ("A general complaint of unfair treatment does not translate into a charge of illegal . . . discrimination"); *Hemphill v. United Parcel Serv., Inc.,* 975 F. Supp. 2d 548, 562-63 (D.S.C. 2013) (finding plaintiff's email with allegations that she was "being treated unfairly," had been "spoken to in a very unprofessional, disrespectful, and degrading manner," had been "verbally threatened about [her] job and [her] life," and had been "openly embarrassed and humiliated" did not constitute protected activity in support of a Title VII retaliation claim); *see Fisher v. City of N. Myrtle Beach*, No. 4:11-CV-01726-RBH, 2013 WL 4018603, at *11 (D.S.C. Aug. 6, 2013) ("Unfair treatment, irrespective of [protected characteristic], does not rise to the level of an unlawful employment action."). Rather, it is elementary that causation requires that the decision-makers responsible for the actions (such as the action plans and "unattainable goals") be aware of specific complaints about "unlawful employment actions," such as race-based discrimination. Without that proof, Plaintiff cannot show that those responsible for his plans and goals—Riggs, Caldwell, Daniel—acted based upon that knowledge.

---

demonstrate the requisite causation (or otherwise change the undersigned's Recommendation herein).

The undersigned finds Plaintiff cannot establish a prima facie case of retaliation under Title VII, making summary judgment appropriate.[20]

C.        State-Law Claims[21]

Defendant also seeks summary judgment as to Plaintiff's state law claims for intentional infliction of emotional distress ("IIED"), negligent retention and supervision, and wrongful termination.[22]

Plaintiff points to the same conduct catalogued above in support of his race discrimination and retaliation allegations to support his state-law-based claim of intentional infliction of emotional distress. Pl.'s Dep. 282-84. Plaintiff claims that Defendant is liable for negligent retention and supervision because, after he complained about Riggs' treatment of him, US Foods did not take action to stop the conduct. *See* Compl. ¶¶ 25-29. Only a portion of Plaintiff's deposition discussing the cause of action for negligent retention and supervision is provided in the record made available to the court. *See* Pl.'s Dep. 389 (Plaintiff testifying he felt every employee should be given "a fair amount of time" to build their business; additional testimony unclear in this record). In support of his state-law claim for wrongful termination,

---

[20] As noted in *Foster*, the causation prong of the prima facie is "less onerous" than the proof required at the pretext stage. 2015 WL 2405266, at *5. In the event it were determined Plaintiff has met that less onerous standard and established a prima facie case, the evidence is insufficient for Plaintiff to establish the but-for causation required in establishing pretext. *See id.* at *6 (noting a plaintiff is required to show retaliation was the "'real reason'" for the action, or, in other words, "to show that the harm would not have occurred in the absence of—that is, but-for—the defendant's conduct.'") (quoting *Holland v. Wash. Homes*, 487 F.3d 208, 218 (4th Cir. 2007) and *Nassar*, 133 S. Ct. at 2525). Granting summary judgment as to Plaintiff's claim of retaliation remains appropriate if considering pretext.

[21] Based on the above recommendation, all federal claims would be ended. There does not appear to be diversity of citizenship, *see* Compl., thus the court would have no independent basis of jurisdiction and could, in its discretion, decline to exercise its supplemental jurisdiction and dismiss this matter with leave to refile the state-law-based claims in state court. *See* 42 U.S.C. §1367. In any event, the undersigned addresses the merits of the state-law-based claims.

[22] Although Plaintiff's responsive memorandum includes a section discussing a state-law claim for interference with contractual relations, Pl.'s Mem. 22-23, that appears to be a scrivener's error as Plaintiff's Complaint contains no such cause of action.

Plaintiff claims that Defendant's alleged constructive discharge of Plaintiff and its discrimination of and retaliation against Plaintiff in violation of Title VII establish his claim that he was wrongfully terminated in violation of public policy. Compl. ¶¶ 23-24. (The court has not been guided to any record evidence discussing the state-law wrongful termination claim.)

In addition to the merits of each of these claims, Defendant argues Plaintiff's claims for IIED and negligent retention and supervision are barred by the South Carolina Worker's Compensation Act ("SCWCA"). The court considers the SCWCA argument first.

1.     SCWCA Exclusivity

Defendant moves to dismiss Plaintiff's claims for IIED and for negligent retention and supervision because they are barred by the exclusivity provision of the SCWCA. Def.'s Mem. 28. The exclusivity provision provides in relevant part as follows:

> The rights and remedies granted by this Title to an employee when he and his employer have accepted the provisions of this Title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin as against his employer, at common law or otherwise, on account of such injury, loss of service or death.

S.C. Code Ann. § 42-1-540. The only exceptions to the exclusivity provision are: (1) when the injury results from the act of a subcontractor who is not the injured person's direct employer; (2) when the injury is not accidental but rather results from the intentional act of the employer or its alter ego; (3) when the tort is slander and the injury is to reputation; or (4) when involving certain occupations expressly excluded by the Act. *Cason v. Duke Energy Corp.*, 560 S.E.2d 891, 893 n.2 (S.C. 2002).

In responding to Defendant's SCWCA exclusivity argument, Plaintiff references the IIED charge only and focuses on the second exception listed above, i.e., when the injury is not accidental but results from an intentional act of the employer or its alter ego. Pl.'s Mem. 19-20

(citing *Stewart v. McLellan's Stores, Co.*, 9 S.E.2d 35 (S.C. 1940), and *McSwain v. Shei*, 402 S.E.2d 890 (S.C. 1991)). Plaintiff submits that Plaintiff's being subjected to more harsh discipline than his co-workers because of retaliation and "intentional discrimination" were not "accidental," but intentional, thus taking them outside the purview of the exclusivity clause. Pl.'s Mem. 20. Plaintiff argues that these "intentional acts of a supervisor should not be insulated" by the SCWCA exclusivity provision. *Id.*

The Supreme Court of South Carolina has held the intentional infliction of emotional distress constitutes a personal injury that falls within the scope of the SCWCA's exclusivity provision. *Loges v. Mack Trucks, Inc.*, 417 S.E.2d 538, 540 (S.C. 1992). The court later affirmed and clarified this holding by stating: "It is only when the tortfeasor/co-employee is the 'alter ego' of the employer that the liability falls outside the scope of the Act." *Dickert v. Metro. Life Ins. Co.*, 428 S.E.2d 700, 701 (1993). The alter ego exception applies only to "'dominant corporate owners and officers.'" *Id.* (quoting 2A Larson, *Workmen's Compensation*, §§ 68.21 and 68.22).

In her brief, Plaintiff omits this distinction, and makes no effort to characterize Plaintiff's "supervisor" as a "dominant corporate owner" or an "officer." Defendant notes this omission on Reply. Def.'s Reply 10-11. To be an alter ego, one must be a dominant corporate owner or officer; the term does not encompass "supervisory employees." *Dickert*, 428 S.E.2d at 701.

The record contains no evidence that any of Plaintiff's supervisors were "dominant corporate owners and officers," nor has Plaintiff demonstrated intentional discrimination. The undersigned agrees with Defendant that the SCWCA exclusivity provision bars Plaintiff's IIED cause of action.

Plaintiff does not challenge Defendant's argument that his claim for negligent retention and supervision is barred by the SCWCA, that state-law cause of action should be ended on these same grounds. *See Lasher v. Day & Zimmerman Int'l, Inc.,* 516 F. Supp. 2d 565, 587 (D.S.C.

2007) (dismissing intentional infliction of emotional distress and negligent supervision and retention claims based on S.C. worker's compensation exclusivity bar); *Sutton v. Securitas Sec. Serv., USA, Inc.*, No. 4:13–2542–MGL, 2014 WL 1513867, at *4-5 (D.S.C. Apr. 16, 2014) (dismissing plaintiff's IIED and negligent retention and supervision claims on grounds that they are barred by SCWCA); *Sabb v. S.C. St. Univ.*, 567 S.E.2d 231 (S.C. 2002) (negligent supervision). Further, the undersigned notes that a cause of action for *negligent* retention and supervision is, by definition, not an *intentional* act. Summary judgment is appropriate.

In addition, Defendant is entitled to summary judgment as to Plaintiff's state-law claims because no material facts are at issue.

### 2.    Plaintiff's IIED Claim

Defendant also submits it is entitled to summary judgment as to Plaintiff's IIED claim if considered on the merits. To recover for IIED, a plaintiff must establish that: (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct; (2) the conduct was so "extreme and outrageous" so as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community;" (3) the actions of the defendant caused plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "severe" such that "no reasonable man could be expected to endure it." *Ford v. Hutson,* 276 S.E.2d 776, 778-79 (S.C. 1981).

Other than repeat these elements, Plaintiff's only argument that his IIED claim should survive summary judgment is that he "was subjected to more harsh discipline than his co workers in retaliation for his complaints about unfair treatment and because of intentional discrimination." Pl.'s Mem. 22. Plaintiff points to no specific record evidence as support.

None of the facts set out above and taken in the light most favorable to Plaintiff indicate conduct that was "so extreme and outrageous" to exceed "all possible bounds of decency." Plaintiff has not established a genuine issue of material fact as to the elements of his IIED claim, and Defendant is entitled to judgment as a matter of law. Summary judgment should be entered as to Plaintiff's IIED claim.

3.     Plaintiff's Claim of Negligent Retention and Supervision

Plaintiff's negligent retention and supervision claim is also subject to judgment as a matter of law on its merits. South Carolina law provides that "an employer is under a duty in some circumstances to exercise reasonable care to control an employee acting outside the scope of his employment." *Degenhart v. Knights of Columbus,* 420 S.E.2d 495, 496 (S.C. 1992).The court set out these elements for establishing such a duty:

> An employer may be liable for negligent supervision if the employee intentionally harms another when he:
> (i) is upon the premises in possession of the [employer] or upon which the [employee] is privileged to enter only as his [employee], or
> (ii) is using a chattel of [the employer], and . . . [the employer]
> (i) knows or has reason to know that he has the ability to control his [employee], and
> (ii) knows or should know of the necessity and opportunity for exercising such control.

*Degenhart* , 420 S.E.2d at 496 (quoting Restatement (2d) of Torts § 317 (1965)).

Defendant submits Plaintiff cannot establish these elements, nor can he demonstrate supervisors Riggs, Caldwell, or Daniel were operating outside of the scope of employment as required to establish a negligent supervision or retention claim. Further, Plaintiff has not demonstrated any "intentional harm" to Plaintiff.

Plaintiff argues Defendant was aware of the complaints by Plaintiff about his supervisors but did not address or correct the behavior. Pl.'s Mem. 23-24. Plaintiff submits liability is appropriate based on "actionable discrimination caused by a supervisor" and an "actionable

35

hostile environment created by a supervisor." *Id.* As discussed above, Plaintiff has not demonstrated an actionable discrimination claim, nor has he shown a hostile environment.[23]

Summary judgment on behalf of Defendant is appropriate as to Plaintiff's claim for negligent retention and supervision.

### 4.    Plaintiff's Wrongful Termination Claim

Defendant also seeks summary judgment as to Plaintiff's wrongful termination claim, arguing Plaintiff does not fall within the public-policy exception to South Carolina's at-will employment doctrine and that the claim is preempted by Title VII. Def.'s Mem. 33-34. The undersigned agrees that summary judgment is appropriate as to this cause of action, as well.

In South Carolina, employment at-will is presumed absent the creation of a specific contract of employment. *Barron v. Labor Finders of S.C.*, 713 S.E.2d 634, 638-39 (S.C. 2011). An at-will employee may be terminated at any time for any reason or for no reason, with or without cause. *Ludwick v. This Minute of Carolina, Inc*., 337 S.E.2d 213, 214 (S.C. 1985). Under the "public policy exception" to the at-will employment doctrine, however, an at-will employee has a cause of action in tort for wrongful termination where there is a retaliatory termination of the at-will employee in violation of a clear mandate of public policy. *Id*. at 216 (1985). The public policy exception applies only in two specific cases when either: (1) the employer requires the employee to violate the law, *Ludwick,* or (2) the reason for the employee's termination itself is a violation of criminal law. *Culler v. Blue Ridge Elec. Co-op., Inc.,* 422 S.E.2d 91-92 (S.C.

---

[23] Plaintiff's Complaint contains no hostile-work-environment claim, nor was a hostile-work-environment (or harassment) claim made part of Plaintiff's Charge of Discrimination. Plaintiff cannot now add such a claim. *See, e.g.*, *Cricket Store 17,  LLC v. City of Columbia*, No. 3:13-CV-3557-TLW, 2015 WL 1499399, at *23 (D.S.C. Mar. 31, 2015) (finding plaintiff could not raise claims for first time in summary judgment briefing) (citing *Bridgeport Music, Inc. v. WM Music Corp.,* 508 F.3d 394, 400 (6th Cir. 2007) (holding that a party may not expand its claims to assert new theories in response to a motion for summary judgment); and *White v. Roche Biomedical Labs., Inc.,* 807 F. Supp. 1212, 1216 (D.S.C. 1992) ("[A] party is generally not permitted to raise a new claim in response to a motion for summary judgment.").

1992) (employee was terminated after he refused to contribute to political action fund, and his termination violated S.C. Code Ann. § 16-17-560).

Plaintiff acknowledges this rule and does not argue he falls within either of them. Rather, Plaintiff argues the public-policy exception is not limited to situations in which an employee is required to violate the law or when the termination itself is a criminal violation, citing South Carolina cases from 1995 and 1997 (citing *Garner v. Morrison Knudsen Corp.*, 456 S.E.2d 907 (S.C. 1995); *Kieger v. Citgo, Coastal Petroleum, Inc.*, 482 S.E.2d 792 (S.C. Ct. App. 1997)). Pl.'s Mem. 21. Plaintiff submits these cases leave open whether other scenarios would fall into the public-policy exception, arguing there is evidence to create an issue of fact as to whether Plaintiff was "a victim of constructive discharge as a result of deliberate scrutiny on the part of supervisors in a way that would cause an employee to be unable to work in a hostile work environment." Pl.'s Mem. 21.

The court agrees with Defendant that summary judgment is appropriate. In *Garner*, the court determined a Rule 12 motion was not the time to decide whether an exception might exist for retaliation against an employee who reported radioactive contamination or unsafe conditions. 456 S.E.2d at 909-10. Similarly, in *Kieger*, the South Carolina Court of Appeals noted the *Garner* decision had "opened the door for further public policy exceptions to the at-will doctrine." 482 S.E.2d at 373. Here, though, Plaintiff seems to seek an exception under his constructive discharge claim based on "deliberate scrutiny" and a hostile work environment. Pl.'s Mem. 21. Plaintiff does not explain how "deliberate scrutiny" in this instance could ever rise to the level of a public-policy violation.[24]

---

[24] As noted above, Plaintiff has not brought a claim for hostile work environment, nor may he add one at this juncture.

Further, earlier this year the South Carolina Supreme Court reiterated the "restraint" employed by the courts in "undertaking the amorphous inquiry of what constitutes public policy." *Taghivand v. Rite Aid Corp.,* 768 S.E.2d 385, 387 (S.C. 2015). In declining to expand the public policy exception to at-will employment by recognizing a public policy favoring the reporting of crimes, the *Taghivand* court noted that any exception to the at-will employment doctrine "should emanate from the General Assembly, and from [the Supreme Court of South Carolina] only when the legislature has not spoken." *Id.* at 389. Given the South Carolina Supreme Court's recent guidance on the issue, the undersigned recommends that the court decline to recognize Plaintiff's suggested public policy exception to at-will employment. The undersigned is not persuaded that the General Assembly of South Carolina intended to create such an exception to at-will employment or that the South Carolina Supreme Court would recognize such an exception.

Summary judgment as to Plaintiff's wrongful-termination claim is appropriate.

IV.     Conclusion and Recommendation

For the reasons set forth herein, it is recommended that Defendant's Motion for Summary Judgment be granted and this matter be ended.

IT IS SO RECOMMENDED.

June 30, 2015                                          Kaymani D. West
Florence, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**